BESSIE LOVELESS, Administratrix, Appellee, v. TOWN OF WILTON, Appellant.

ELECTRICITY: Duty to Licensees. The owner of an electric light
1 and power company is under a legal duty to notify the employees of an independent contractor of the hidden dangerous condition of wires carrying electric current, when the employees are ignorant of such danger.

EVIDENCE:    Relevancy, Materiality, and Competency—Issue in re
2    Negligence.    On the issue whether the owner of an electric light
and power plant had charged certain wires with a dangerous elec-
tric current without notifying the parties working in the vicinity,
it may be shown that the owner had impliedly agreed not to turn
on the current until notified so to do.

*Appeal from Muscatine District Court.*—F. D. LETTS, Judge.

JUNE 23, 1922.

PLAINTIFF, as the administratrix of the estate of her hus-
band, brought this action to recover damages by reason of his
death, through coming in contact with an electric wire, which
was attached to a water tank owned by the defendant, and upon
which deceased, at the time, was working.    Trial to a jury.
Verdict for plaintiff in the sum of $20,000.    One ground of the
motion for new trial was that the damages awarded were exces-
sive.    The court so held, and required plaintiff to elect to take
judgment for $12,000, or submit to a new trial.    Plaintiff filed
such election, and judgment was entered against defendant for
$12,000.    The defendant appeals.—*Affirmed.*

*E. M. Warner,* for appellant.

*Charles P. Hanley* and *Thompson & Thompson,* for appellee.

PRESTON, J.—There is a conflict in the evidence at some
points, but much of the testimony is undisputed.    The trial
court, in an instruction of which appellant does not complain,
stated the undisputed facts, and submitted to the jury, for its
determination, certain matters which were in conflict.    The court
withdrew certain grounds of alleged negligence, and submitted
only those hereinafter referred to.    The trial court properly
instructed the jury that deceased was, at the time he was in-
jured, in the employ of Taggue & McGaughey, a partnership,
as we understand it, who had the contract with defendant town;
although, as a part of his compensation, deceased was to receive
a part of the money to be paid by defendant to said partnership.
The circumstances of the employment of deceased did not make

him a partner in the firm, as contended by appellant. The evidence tends to show that deceased had nothing to do for defendant town; he worked for his employers. The first contract was to paint the outside of the tank. Later, another or additional contract was made between the same persons, to scrape the inside of the tank and paint it for a stated compensation, and the town was to put equipment in the tank for electric light, and to furnish the light. Deceased was employed after the first contract was made. The work was begun soon after the second or additional contract, and two or three days before deceased was injured. The accident happened on Thursday, June 10th, a few minutes before noon. The jury could have found, from the conflicting and the undisputed evidence, that, on and prior to May 15, 1920, defendant owned, maintained, and operated a waterworks plant, a part of which plant is a water supply tank, which is supported by steel standards about 60 feet long. At said time, the defendant also owned, maintained, and operated an electric lighting plant. The tank was of steel construction, circular in shape, and had a steel balcony which encircled it at the point where the tank was attached to the supporting legs or standards. This balcony had a railing on its outer edge, constructed of steel rods or bars, attached to iron or steel standards. It was for the use or convenience of persons required to work upon the tank. There had been, prior to June 10, 1920, two bare, uninsulated wires attached to a pole on Cherry Street, which pole was a part of defendant's electric lighting system; and the two wires ran to the railing of the balcony on the water tank, and were attached thereto upon insulators. Said wires, prior to June 10th, ran from the railing to the top of the water supply tank, and thence into the tank, for the purpose of transmitting an electric current to operate a device placed inside of the tank and used for the purpose of signaling from the supply tank to the power house, to indicate to the engineer when the tank was full and when it was empty. The signaling device had not been used for some months prior to June, 1920. As before stated, defendant entered into a contract to clean and paint the water supply tank. On said June 10th, deceased was engaged with his employers in painting the outside of the

tank. Some time during the course of the work in painting and cleaning the tank, said Taggue requested the defendant city to provide an electric light inside the tank, to enable them to see in cleaning and painting the inside. Pursuant to such request, defendant, by its electricians, attached certain wires to the signaling wires at the point where they entered the tank through a trap down into the tank, with an electric bulb affixed thereto. After said work had been done by the electricians in installing the light inside of the tank, deceased, who had been working upon a rigging or swinging scaffold, in painting the outside, came in contact with the charged wires, and fell from the scaffold to the ground below, and thereby received injuries from which he died in the evening of that day.

Up to this point, there is substantially no dispute in the evidence. Appellant contends that the evidence was such that deceased and his employers knew, or should have known, that the electricity had been turned on by defendant's electricians and employees, before deceased was hurt. There are some circumstances in the evidence tending to so show. On the other hand, appellee's evidence and the weight of it—at least the jury could have so found—tends to show the contrary. A summary of plaintiff's testimony on this point is that, on the day before the accident, Taggue asked the city officials of defendant town to put equipment in the tank, so they could have light to work by. He first went to one of the officials, with whom he made the contract, and was sent to the power house to see the engineer; and Taggue said the same thing to the engineer, who replied that he would let the city electrician know about it, and he would attend to it. Taggue told the engineer that, when they were ready for the electricity, he would let the engineer know. Taggue says that at no time did he tell the engineer to turn on the electric current, and that he did not authorize anyone else to do so for him. On the morning of the accident, Taggue informed the city electrician that he wanted equipment for light in the tank, and was informed by the city electrician that he was sick, and that one Hall had taken his place, and was acting as city electrician. Taggue then went back to the tank, and in an hour or so, two men appeared at the tank, with equipment for installing

the electric light. These two men were Hall, acting city electrician, and his brother. After they had apparently completed their work of installation, Taggue said to them that he would not be ready to go into the tank the next morning, and that he would let them know when to turn on the electricity, and the electrician answered, "All right." At this time, deceased and his coworker, McGaughey, were beneath the platform or scaffold, and more than ten feet away from the electricians while they were working, and some ten feet away from the insulators. The electricians did not tell McGaughey or deceased what they were doing, or that the current had been turned on. A day or so before the accident, McGaughey stood on the balcony, painting the two insulators, and touched the wires which were attached thereto, and which came from the pole on Cherry Street, and received no shock. Deceased was standing by him, and McGaughey told deceased that there was no current in the wires. About two hours after deceased had fallen, McGaughey again touched the same wires, and received a shock of electricity. None of the workmen engaged in painting the tank saw the acting city electrician and his brother cut the wires at the pole on Cherry Street and attach them to the power line. During all the time the electricians were present at the water tank, deceased was absorbed in his work in painting the lower bowl of the tank, on a swinging scaffold, which was underneath the circular platform upon and above which the electricians were working. At the time deceased fell, the platform had been shifted, so that he was working immediately below the wires that ran to the insulators. While deceased was sitting on the swinging scaffold under the wires, he would have had to lean backward and look upward, to see the wires. An electrician of long experience testified that a service wire is one running from a main feeder wire to a building that is to be served with electric light; that wires running from a main line down to the water tank, as described, would be termed service wires. He also testifies as to what would have been the proper way to insulate and attach these wires to the tank, and how they should have been run into the tank.

The only ground of negligence submitted to the jury is

stated in Instruction No. 5, wherein the jury was told that plaintiff must establish: First, that the defendant was negligent in this: that, after the bare and uninsulated wires, formerly used to operate the signaling device in the tank, had been converted into a service line for the installation of lights in the tank, for the use of Loveless and his employers in cleaning and painting the inside of the tank, the defendant town, by its officers or employees, charged said wires with an electric current, without notice to said Loveless, and negligently failed to notify said Loveless that the wires were so charged with electric current. Second, that Loveless was caused to fall from the scaffold because thereof. Third, freedom from contributory negligence. Fourth, damages. We have abbreviated all but the first paragraph. In Instruction No. 7, the jury was told that deceased was one of the employees of Taggue & McGaughey; that Taggue & McGaughey were independent contractors, who were engaged by the defendant town to do the cleaning and painting in question; that defendant owed said Loveless no duty for his protection, except such as arises out of the fact that he was there upon the premises of the defendant, and at its invitation, to do certain work upon their water supply tank which they desired to be done; and that, having been invited by defendant for that purpose, Loveless had a right to assume that defendant would not expose him, while doing the work upon the tank, to great and serious dangers connected with the premises, of which he had no knowledge, but which were well known to the defendant town, by its officers and employees; and that the defendant owed said Loveless the duty to warn him of any danger of which it, by its officers and employees, knew, or in the exercise of reasonable care ought to have known, and of which Loveless was not aware. Another part of Instruction No. 7 reads:

"The evidence is clear that, prior to the converting the wires formerly used for the signaling device, into a service wire for lights, Loveless knew that the wires leading from defendant's pole on Cherry Street to the railing of the balcony of the supply tank were bare and uninsulated; and you are told, as a matter of law, that his knowledge of such facts gave him as much notice of the danger which might reasonably be expected to exist be-

cause of such fact as the defendant town had, or could have had. The contention of the plaintiff is that, before the signaling wires had been converted into a service wire for lights, the un-insulated wires in question were not charged with electric cur-rent, and that Loveless knew that they were not charged with current; but that the converting of said signaling wires into service wires for lights so altered the circumstances that the de-fendant town owed Loveless the duty of notifying him when the current was turned into the wires in question for the lights; that the defendant town, by its officers and agents, knew, or in the exercise of reasonable care would have known, when said cur-rent was turned on; and that Loveless had no way of knowing that fact, except through notice from the defendant town, its officers or employees; and that the defendant town failed, through its officers or employees, to notify Loveless of the fact that the current had been turned into the wires in question; that the current was turned into the wires without notice; and that, in doing so, the defendant violated its duty to warn Loveless of the change in the situation; and that, in failing to do so, the defendant town was guilty of negligence."

The jury was further told therein that defendant's conten-tion is that it did notify Loveless and his employers, when the work in converting the signal wires into service wires was com-pleted, that the electric current was on; and that it did all that was required of it. This controverted question was left to the jury. Appellee thinks that the court should have submitted other grounds of negligence; but there is no occasion to discuss that matter. The exceptions to Instructions 5 and 7 are, sub-stantially, that the duty rested upon Taggue, and not upon the defendant, to warn the employees of the independent contrac-tor, Taggue, and that the jury should have been told that the duty rested upon Taggue to warn his employees of any and all hidden dangers in and about the premises which he had caused to exist by his method of performing his contract. We have seen that it was not a part of Taggue's contract to furnish the light or wiring, and that the jury could have found that neither deceased nor his employers knew that the electricity had been turned on. Though Taggue and his partner were independent

contractors, their employee, Loveless, was not a trespasser. A determination of the foregoing proposition will determine the error assigned that the court erred in overruling defendant's motion for a directed verdict because no negligence was shown. The propositions may be considered together. These 'are the main points in the case.

1. Appellant's proposition is that the owner of property is not liable for injuries to the servant of an independent contractor when the injuries result from the negligence of the independent contractor, and in the absence of neg-

1. ELECTRICITY: ligence on the part of the owner. This assumes duty to licensees. that the negligence complained of was that of Taggue and his partner, and that the defendant was not guilty of negligence. Appellant cites the following cases to sustain the proposition: *Reilly v. Chicago & N. W. R. Co.*, 122 Iowa 525; *Humpton v. Unterkircher*, 97 Iowa 509; *Neimeyer v. Weyerhaueser*, 95 Iowa 497; *Hoff v. Shockley*, 122 Iowa 720. In the *Reilly* case, it was said that the duty of an independent contractor to furnish his employee a safe place to work and maintain the same cannot ordinarily be extended to include the party for whom the contractor has undertaken the work. It was conceded by the plaintiff in that case that he was in the employ of an independent contractor, and that, as the injury complained of was the result solely of the negligence of the latter, no recovery could be had against the owner, or railway company. It was sought to avoid the application of this rule by claiming that the company was negligent in running its trains at a recklessly high rate of speed, and other matters. It was held that the railway company did not owe the plaintiff, a track laborer, such duties. In the *Hoff* case, the negligence claimed was in failing to barricade and place warning lights on a pile of sand placed in the street by the independent contractor. That was the duty of the contractor. It is unnecessary to further discuss the cited cases. An examination of them shows that the facts herein are quite dissimilar. In the *Neimeyer* case, the mill owner was held liable under the facts of the case. None of the cases cited are electricity cases.

On the other hand, it is contended by appellee that it was

the duty of the town to warn the contractor's employees of the turning on of the electricity,—that is, of the change from a safe to an unsafe condition. This was the theory of the court's instructions in the instant case. In Curtis on The Law of Electricity, at page 688, it is said that, where a person is permitted to go upon the premises of a third party, with the consent or acquiescence of the owner, and the place is one where the presence of persons may reasonably be anticipated, an electric company having its appliances in such a place is bound to use due care to protect such persons from injury; and that this is so whether such persons be termed "invitees," "licensees," or "not trespassers." The text is supported by a number of cases. See, also, 20 Corpus Juris 353, where it is said that:

"Where the person injured was present at the place in question by the express or implied invitation of the owner or occupant, he is neither a trespasser nor a bare licensee, and as to him the general law of negligence imposes the duty of exercising due care to prevent injury. Employees of independent or subcontractors engaged to do work about the premises, are there by invitation, within this rule"—citing a large number of cases.

The degree of care required of electric companies is stated in 20 Corpus Juris 341, 342, 343. The rule in Iowa is stated in *Evans v. Oskaloosa Trac. & Lt. Co.*, 192 Iowa 1. The facts in that case are somewhat similar to those in the instant case. Appellee cites on this point *Aga v. Harbach*, 140 Iowa 606; *Steele v. Grahl-Peterson Co.*, 135 Iowa 418; *Samuelson v. Cleveland Iron Min. Co.*, 49 Mich. 164 (13 N. W. 499); *Huey v. City of Atlanta*, 8 Ga. App. 597 (70 S. E. 71); *Eller v. Loomis*, 106 Iowa 276; *Knowlton v. Des Moines Edison Lt. Co.*, 117 Iowa 451; *Connell v. Keokuk Elec. R. & P. Co.*, 131 Iowa 622; *Fidelity & Cas. Co. v. Cedar Valley Elec. Co.*, 187 Iowa 1014, 1023; and other cases. We deem it unnecessary to review these or any of the cases further. We think the instructions complained of are sustained by the authorities.

2. It is thought by appellant that the court should have directed a verdict for the defendant on the ground that deceased was guilty of contributory negligence as matter of law. Some of the circumstances surrounding deceased at the time have

been referred to, and we shall not go into further detail in reference thereto. The trial court instructed the jury quite fully in regard to this, and enumerated a number of circumstances which the jury might properly consider as bearing upon this question, and stated that the jury should consider all the circumstances then surrounding deceased, as shown by the evidence. We are quite clear that this was a question for the jury.

3. Another assignment of error is that the court erred in overruling defendant's objection to the following questions put to the witness *Taggue,* the objection being that it called for evidence which was incompetent, irrelevant, immaterial, and hearsay.

2. EVIDENCE: relevancy, materiality, and competency: issue *in re* negligence.

"Q. What, if anything, did you hear Mr. Taggue say to the electrician? A. Well, he said that we wouldn't be ready to go into the tank the next morning, and he would let him know when we were ready to go in, or when we needed the light. Q. What, if anything, did the electrician say to Mr. Taggue, when Taggue told him he would let him know when to turn on the juice? A. I think he said, 'All right.' "

Counsel refers us to a certain page in the abstract which shows that the witness *McGaughey* was the one testifying as above, and to the conversation he heard between Taggue and the Halls. Taggue testified in regard to the same matter, and without objection, that one of the electricians said, in answer to the last question, "All right." Witness McGaughey was testifying, as above set out, to the conversation he heard between Taggue and the two electricians, the Halls, at the time they were installing the wires on the tank. The Halls were properly acting as electricians in the work for defendant, and we do not understand appellant to claim otherwise. They were being notified by Taggue when he would be ready to have the electricity turned on, to light the inside of the tank, according to the agreement with defendant. It was not hearsay, nor were any of the objections well taken. The argument now is that, in view of the contract, and since the light was being installed when it was at the request of Taggue to Darting, the officer of the town with whom Taggue made the contract, a subsequent

notice or request to the Halls, engaged in installing the light, would not be a request to the town, or notice to it that Taggue had changed his mind, and desired the work to be done at another time. The objection made was not sufficiently specific to cover the proposition now urged. *State v. Madden,* 170 Iowa 230; *State v. Wilson,* 157 Iowa 698, 713. Furthermore, it is not the record that there was any change of the contract, or any change of mind on the part of Taggue. The original contract was that the town was to furnish the light; Taggue had told the engineer that he would let him know when he was ready; and he told the Halls, when they were putting in the wires, and before the electricity had been turned on, that he would tell them when they would be ready for it. They were then working on the outside, and he was told that they would not be ready for it the next morning. This conversation took place in the forenoon of the day deceased was injured. No time had been fixed in any of the conversations with Darting or with the engineer as to when they would be ready. In the talk with the Halls, Taggue was simply telling them that they would not be ready the next morning, and that he would let them know when they were ready to go in. The current must have been turned on soon after that, and the jury could have found, from the evidence, that it was without authority from Taggue & McGaughey, or notice to any of those working on the tank. When Taggue told the engineer about it, he was referred to the city electrician. Pursuant to that, the Halls appeared, acting for the town, and the conversation referred to took place.

4. Finally, it is argued that the court erred in denying defendant's motion for new trial for all the reasons set out therein, and especially because the verdict is not sustained by the evidence, because of the errors of the court in the charge to the jury, and because it appears that the verdict was the result of passion and prejudice; and that the reduction of the verdict was insufficient to cure the error. The assignment is somewhat indefinite. All the matters therein have been discussed, except the amount of the verdict. No cases are cited on this proposition, and the point seems not to be seriously relied upon. Considering the age of deceased, his earning capacity,

savings, and all the circumstances, there was no error in regard to this matter.

The judgment is—*Affirmed.*

Stevens, C. J., Weaver and De Graff, JJ., concur.